Argued and submitted December 7, 1979, affirmed as modified and remanded January 28, 1980

In the Matter of the Marriage of
HANDY,
*Respondent,*
*and*
HANDY,
*Appellant.*

(No. 78-9-169, CA 14653)

605 P2d 738

John Henry Hingson III, Oregon City, argued the cause for appellant. With him on the brief was Marc Sussman, Oregon City.

Jack Stuart Bernstein, Gladstone, argued the cause and filed the brief for respondent.

Before Joseph, Presiding Judge, and Lee and Richardson, Judges.

JOSEPH, P.J.

Lee, J., dissenting opinion.

## JOSEPH, P.J.

In this appeal from a dissolution proceeding the issues relate solely to custody of the children. Father and mother were married nine years. They have a girl, six, and a boy, three. Father filed for dissolution on September 13, 1978 and sought custody of the minor children. At a *pendente lite* hearing on November 17, 1978, father acknowledged that the mother provided proper day-to-day care of the children and agreed that custody should then remain with her. The court awarded temporary custody to mother with visitation by father.

During the pendency of the proceedings, mother began living with a man who had been the parties' next door neighbor. They had no definite plan to marry. Father began living with the widowed mother of two girls, ages eight and four. They plan to marry, according to their testimony. They would raise all four children in her house, if it could be enlarged to have adequate space, or in another house they would buy. Mother has been primarily responsible for rearing the children. Father testified that mother did not do a very good job of caring for the children (because she sometimes served inadequate meals and failed to do the laundry properly), but he acknowledged that they did receive good physical care. The son has seemed more nervous and apprehensive since the separation, according to father's witnesses, and the daughter seemed to be more quiet and to be seeking love and affection, but she was not as nervous as the son and appeared to be as normal as could be expected from a broken marriage. Both played well with other children. On occasion the children may have been dressed by mother with inappropriate clothing for the weather or their size.

Both father and mother disciplined the children by spankings on occasion. Father spanked the children with his hands; mother used a wooden spoon or spatula, because she has tender hands which bruise easily,

[227]

she claimed. On two or three occasions her companion also disciplined the children by spanking them. As a result of his doing that, arguments arose between mother and father, the latter insisting that the friend not discipline the children. At least one argument took place in front of the children, which led to mother telling father that he was no longer welcome in the house unless invited. The father did not subsequently return to visit in the house, but he continued to enjoy his visitation rights. Mother has avoided living near father because, she said, she did not want to subject the children to their arguments.

During one visitation the father observed bruises on the buttocks and lower back of the son. The bruises occurred after an incident when police were searching for a reported child molester seen in the neighborhood. Although mother locked the son in the house and told him to stay inside, while she was assisting the police, he was able to get outside. When mother discovered the son had gone out, she became upset and administered an unusually vigorous spanking to teach him a lesson to protect him in the future. No bruises had ever been seen on the daughter. Like mother, the children also were said to have a condition which causes them to bruise easily.

At times the children have been cared for by mother's sisters. On one occasion the son was crying and refused to be returned home when his mother was not home, because he did not want to be left with mother's companion. The children have a good relationship with father and his girlfriend. The father has become close to members of the mother's family. Along with members of mother's family, he has paid tuition for the children to go to a private religious school; mother has been unable to afford to pay any of the tuition. As a result of the marital discord, a serious rift developed between mother and her family. She had been called a whore by her father on at least one occasion, and she has had little contact with her mother or father during this time. Apparently the

[228]

family has some sort of religious objection to mother's conduct, but not to father's.

At the trial in May, 1979, father contested custody. In a letter opinion the court ordered joint custody (which neither party had sought) with physical custody of the children to be in the father. Mother moved for a stay of the decree and the motion was allowed by the trial court.

The trial judge ordered that there be "joint legal custody." He construed ORS 107.105(1)(a) to permit him to do that even in the absence of a request from either party and also in the face of all the evidence which showed that the parties had little or no interest in or ability to agree on anything about the children. He based his decision on the following reasoning:

> "I haven't done this before on a case involving custody but the Legislature must have had some situation in mind to allow joint custody. To give custody to one parent over another would indicate to some people that the noncustodial parent is not qualified. That is not the situation here. I think the mother is qualified but I think the father is equally or better qualified but it's the father's plans to provide the home life for the children that influences me. Therefore, the Decree will provide that the mother and father will have joint custody with physical custody in the father. Hopefully both the parents will have the welfare of the children in mind and they will be able to work out a liberal visitation schedule. However, if this is not possible I would be glad to set up a visitation schedule ***. As I said, I hope that the visitation schedule can be worked out between the parents. ***"

We need not decide now whether a court may *ever* compel joint custody, although it is very difficult to imagine circumstances where it would be appropriate without the desire or consent of both parties. *Cf. Braiman v. Braiman,* 44 NY2d 584, 586, 407 NYS2d 449, 378 NE2d 1019 (1978); and *Stamper v. Stamper,* 3 Fam L Rep 2541 (Mich Cir Ct, Wayne County, June 16, 1977). Furthermore, we do not comprehend the

concept of separating "joint legal custody" from "physical custody."[1] We are satisfied beyond a shadow of a doubt here that there can be no hope reasonably held that joint custody would be productive in the present circumstances of anything certain but never-ending turmoil in the children's lives. The joint custody provision is deleted. *See Bohn and Bohn,* 43 Or App 561, 603 P2d 781 (1979).

In his letter opinion the trial judge said, with respect to physical custody of the children:

"*** [T]he main issue in this case *** is the custody of the children. I have some sympathy for the mother because of the way her family is treating her. Perhaps they feel her actions in the past have not justified their acceptance of her, but when they propose to be good 'Christians' and have the antagonisms and prejudices they do causes me to believe I don't know what the word 'Christian' is supposed to mean. The overwhelming evidence preponderates in favor of the father,[2] but it is my conclusion that much of this is based on the hostility towards the mother for reasons that would not necessarily militate against her qualifications of being a good custodial parent. I have no great quarrel with how she has taken care of the children except that her custody does exclude them from many family activities that we oftentimes consider to be beneficial to the children. Also, her disciplinary methods may perhaps be too severe in the eyes of some people, but I think she is influenced somewhat by the paramour with whom she lives, and it seems obvious to me the children resent him. [3] He appears to me to be too severe, nonhumorous and entirely too serious in his approach to family life. His

---

[1] ORS 107.105(1)(a) does not seem to recognize a distinction between "joint legal custody" and "physical custody" in its terminology authorizing a court to decree "future care and custody *** by one party or jointly."

[2] We understand that this phrase to mean "The quantity of evidence overwhelmingly preponderates in favor of the father," which reflects that father's witnesses included not only his sister, but mother's sister and mother; her witnesses were herself and her living companion.

[3] Nothing in the record indicates the trial judge interviewed the children. There was testimony for and by father which tended to support the judge's "obvious" conclusion.

[230]

household didn't have the looseness and relaxation that you like to see in couples rearing young children, but my conclusion is that the mother is probably as qualified as a custodial parent as many of the people who appear before me.

"On the other hand, I was impressed with the support the father has for custody. He appeared to be a down-to-earth sort of a man who would take what time is necessary to give attention to the children. I heard no evidence that would detract from his ability to be the custodial parent. In my opinion, the father has the edge on qualifications. However, that isn't the feature of this case that causes me to reach my ultimate decision. No one in the courtroom who heard the testimony of his bride-to-be could help but conclude that she would be an excellent influencing factor for the good of the children. She appears to have all those soft qualities, tenderness and humor that go to make up a good custodial parent. The father and she have definite marriage plans. There are no marriage plans by the mother, but the only evidence I heard was that she and [the companion] would continue living together. I'm not advocating remarriage in every situation as a condition to secure custody of the children, but in this case it is the impression that her's girlfriend has made on me that causes me to make the decision I have concerning the children. I think this lady will be an excellent wife for Mr. Handy and she manifested genuine love and interest in the children. As I say, it is the future plans of the father that causes me to make my decision the way I have."[4]

---

[4] The girlfriend's testimony was brief and warrants being quoted in full in the light of the weight given it by the trial court:

[MR. BAGLEY]:

"Q *** I understand that you are acquainted with Terry George Handy, the petitioner in this proceeding, is that correct?

"A Yes.

"Q Mr. Handy lives with you and your children, is that correct?

"A Yes.

"Q Would you explain to the Court what you and Mr. Handy's plans are for the future—

"A Well, if and we would like to have custody of the kids. And if that was possible, we would either buy a bigger house or add to the house that we have so that we have adequate room.

"Q Do you have children of your own?

"A Yes, I do.

"Q How many?

"A Two girls.

"Q What are their ages?

"A Eight and four.

"Q Are you employed outside the home?

"A No, I'm not.

"Q You are a widow, is that correct?

"A Yes.

"Q On the occasions when Mr. Handy has custody of his children for the weekend visitation, is there sufficient room in your home for the six of you?

"A Yes, we make room.

"Q And it would be your plan evidently to either add on an additional bedroom or obtain a larger house?

"A Right.

"Q Do you feel that you would be able to provide the care and supervision to four relatively young children?

"A Yes.

"Q How do you get along with the Handy children, Theresa and Paul?

"A Real well.

"Q Have you observed Mr. Handy caring for his children on weekends?

"A Yes.

"Q And does he appear to be a competent father?

"A Yes, he does real well taking care of them.

"Q How do the children relate to Mr. Handy? How do they get along?

"A They are really anxious to see him and they spend time just playing with him and being with him.

[232]

"Q On the weekends that Mr. Handy's children have been with you, have you observed any physical problems that either Theresa or Paul have had?

"A Yes, just recently with Paul.

"Q What was that condition?

"A He seemed to be very nervous when he spilled some pop on the floor. And Terry went to clean it up and he got real upset and started crying and was afraid to go to Terry. We figured it was a fear of punishment for some reason.

"Q Are there any other incidents that you recall?

"A No, not that I can think of.

"Q Now, does Mr. Handy contribute to the household expenses?

"A Yes, he does.

"Q How much does he pay a month?

"A It varies. He pays between 120 and 150, depending on the bills for that month.

"Q And do you use that to apply to your own house payment and food expenses?

"A Yes, and groceries, yes.

"Q And other than that, does Mr. Handy make any other contribution to you?

"A Oh, yes, he helps around the house if that is what you mean.

"Q In terms of paying cash for anything?

"A Oh, he will come home with food and groceries out of—just when he stops at the store and he will bring home bread and milk, whatever has, you know, been picked up during the week, besides the groceries that I buy.

"Q But the only amounts that you receive monthly is something after the payment of his bills and has been in the range of 125, $150?

"A Right.

[MR. BAGLEY]

"Thank you, I have no questions.

"CROSS-EXAMINATION

[BY MR. HINGSON]

"Q *** [H]ow much do you get from other outside sources each month? I understand you get some money from Social Security, is this right?

[233]

Once again we face the conundrum discussed by the Supreme Court in *Rea v. Rea,* 195 Or 252, 261, 245 P2d 884, 35 ALR2d 612 (1952):

" ' * * * We are constrained to add however, that we have grave doubts as to whether any appellate court, acting on a cold record, is as likely to arrive at a wise decision concerning child custody, as is the trial judge who sees the parents, hears the testimony, and observes the child. It is for this reason that we have repeatedly held that the decision of the trial court is entitled to great weight in such cases. This court is ill-equipped to exercise a wise and humane discretion on a record which, of necessity, fails to disclose the

"A Right. I get a monthly salary of 938.10 from Social Security.

"Q What is your mortgage payment a month?

"A It is 174.

[MR. HINGSON]

"Thank you very much, I have no further questions.

[THE COURT]

"That part that is allocated as a widow will be reduced when you and Mr. Handy marry?

[THE WITNESS]

"That's right, it would be reduced 312.70 a month. .

[THE COURT]

"That is the allowance for you, 312.70?

[THE WITNESS]

"Yes.

[THE COURT]

"Okay, thank you.

"REDIRECT EXAMINATION

[BY MR. BAGLEY]

"Q Do the benefits you will be receiving for your two children, would be approximately $600 a month after your marriage to Mr. Handy?

"A Yes. I'm putting that away for their schooling.

[MR. BAGLEY]

"Thank you."

subtle, but highly persuasive, evidences which are manifest to the trial judge. A wise appraisal of the character, fitness, emotional stability, affection, hostility, or motive, of the parties to a contested divorce case, who are competing for the custody of a child, or a like appraisal of the inner attitude of the child itself, requires more than can generally be made to appear on the printed page.' "

In this instance, however, the trial judge properly and commendably made quite clear the subtleties of his decision. He concluded that the father "has the edge" in being the parent who ought to have care and custody of the children—but that "edge" was not decisive. What was decisive was his appraisal of the "bride-to-be" as part of the future plans of the father for raising the children.

We review *de novo,* ORS 19.125(3), giving due weight to the cautions expressed in *Rea v. Rea, supra,* but being nonetheless not bound by the trial court's ultimate exercise of judgment. We must make an independent determination of the "best interests and welfare" of the children. ORS 107.137(1). Mother would have us overrule *Cooley v. Cooley,* 1 Or App 223, 461 P2d 65 (1969) and apply the test of change of circumstances to this original custody matter, but we will not do so. *See Deffenbaugh and Deffenbaugh,* 286 Or 759, 774, 596 P2d 966 (1979). The problem before us is whether, all else being equal or very nearly so, custody should be awarded to the parent whose announced plan to remarry in the near but indefinite future bodes well to produce a desirable home environment for the children or whether, in the absence of persuasive evidence that their present living situation is deleterious to their health or well-being, the children should be left in the custody of the parent who has had the primary parental function.[5] *See* ORS 107.137(4).

---

[5] We note that in no event would the children live in the home their parents occupied together. The decree ordered that sold, and neither party contests that or any other part of the decree.

To answer the question does not require us to dispute the appraisal the trial judge made of husband's girlfriend. Nor do we need to revise the judge's prediction that when they do marry, they could together provide a suitable home environment for the children. We can even agree that it might be a better home than they have with their mother. Both mother and father are qualified parents. Presently the children would be reasonably well off with either of them, but the fact is that the mother has had and has the primary parenting role. To change their custody on the basis of what might be true when father remarries is too speculative. In effect the trial judge held that if and when the husband acquired the new wife, she would be a better mother for the children than their real mother. We believe that to be an improper basis for a custody decision.

We note, too, that the testimony by mother's sister and mother evidenced their desire to separate the children, not only from the influence of mother's companion, but from mother herself. We are disinclined to assist in furthering that objective. If, as also appears from their testimony, they and other members of mother's family have genuine love for and interest in the children, it would be in the children's interest for the relatives to accommodate themselves to custody in the mother.

We conclude that the best interests of the children would be served by custody in the mother.

Affirmed as modified and remanded with instructions to award custody to mother and fix an appropriate amount of child support to be paid by husband.

**LEE, J.,** dissenting in part.

I agree with the majority that "joint custody" is inappropriate under the circumstances of this case, but disagree with the award of custody to the mother.

[236]

This case is in many respects similar to our recent decision in *Bohn and Bohn,* 43 Or App 561, 603 P2d 781 (1979), in which we awarded custody to the father. In my opinion, the best interests of the children require that we do likewise in this case.

Accordingly, I respectfully dissent from that portion of the majority opinion.