# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00891-COA

**DANA M. PATRICK**                                                                    **APPELLANT**

**v.**

**CHRISTOPHER L. PATRICK**                                                      **APPELLEE**

DATE OF JUDGMENT:                01/06/2021
TRIAL JUDGE:                     HON. TROY FARRELL ODOM
COURT FROM WHICH APPEALED:       RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          JOHN G. HOLADAY
ATTORNEY FOR APPELLEE:           SHARON PATTERSON THIBODEAUX
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                     AFFIRMED - 03/05/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On January 6, 2021, a judgment was entered in the Rankin County Chancery Court denying Dana M. Patrick's "Petition for Contempt and for Modification" and granting Christopher L. Patrick's "Motion for Modification of Custody." Aggrieved by the court's decision, Dana appeals.

## FACTS AND PROCEDURAL HISTORY

¶2.     Dana and Christopher Patrick married on April 26, 2010, in Rankin County. Two sons were born of the marriage, B.P., born in June 2010, and E.P., born in August 2011.[1] Dana and Chris separated on November 17, 2012, and Dana filed a complaint for divorce on December 19, 2012. A "Final Judgment of Divorce-Irreconcilable Differences" was entered on September 9, 2014. A "Child Custody and Support and Property Settlement Agreement"

---

[1] We use initials to protect the identity of the minor children.

was signed by the parties and incorporated into the final judgment by court order. The parties agreed to share joint legal and physical custody of the minor children.

¶3. The parties filed several motions after the entry of the final judgment of divorce, both in chancery court and in youth court. The bulk of these motions, spanning a six-year period, involved allegations of child abuse and efforts to modify custody. Some of these motions and rulings will be discussed below as they relate to specific assignments of error.[2] As noted above, this appeal stems from the judgment entered in chancery court on January 6, 2021. This judgment was rendered after seven days of trial related to Dana's "Petition for Contempt and for Modification," which had been filed on January 15, 2019, and a portion of Chris' "Motion for Temporary Restraining Order, Citation of Contempt, and Modification of Custody," which had been filed on November 17, 2017. The court denied Dana's request for relief but granted Chris' request for modification of custody. The chancellor found that Dana had created a change in the "custodial environment detrimental to the children's well-being." Then, after conducting an *Albright* analysis,[3] the chancellor awarded Chris sole physical and legal custody of the minor children. Dana appealed.

**ANALYSIS**

¶4. The issues Dana raises on appeal are re-ordered, and some are restated or combined for purposes of this analysis.

---

[2] Not all of the motions, rulings, and transcripts of hearings after the entry of the final judgment of divorce are included in this record on appeal. However, references are made to prior events in orders that are included in the record and upon which the chancellors relied when making their rulings.

[3] *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

**I.** **Dana contends that the trial court erred when it sua sponte modified legal custody of the minor children of the parties despite Chris not specifically requesting that relief in his "Motion for Temporary Restraining Order, Citation of Contempt, Sanctions, and Modification of Custody" or at the trial.**

¶5.     In this assignment of error, Dana contends that the trial court erred by modifying the original custody agreement that provided for joint legal custody of the minor children because the motion filed by Chris on November 17, 2017,[4] contains no request for the modification of legal custody.[5] Dana further argues that because Chris did not request a modification of legal custody at trial, the issue of legal custody cannot be said to have been tried by consent as provided for by Mississippi Rule of Civil Procedure 15(b). Therefore, citing *Purviance v. Burgess*, 980 So. 2d 308 (Miss. Ct. App. 2007), and *Massey v. Huggins*, 799 So. 2d 902 (Miss. Ct. App. 2001), Dana contends that the chancellor's sua sponte modification of legal custody violated her due process rights and requires reversal of the judgment.

¶6.     The issue of legal custody was clearly before the court at Dana's request. In her motion for modification, Dana requested that the custody provision be modified to award her "full legal and physical custody" of the minor children. At the beginning of the trial, there

_____

[4] Although cited by the chancellor in the judgment, we find that this motion was not properly before the court. There is no evidence in the record that Dana was given notice that this motion was to be considered. Further, as will be discussed below, neither the parties nor the chancellor mentioned this motion in the pre-trial discussion of what matters would be heard.

[5] Pursuant to Mississippi Code Annotated section 93-5-24(5)(d) (Rev. 2018): "'legal custody' means the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child."

3

was an exchange between the court and counsel for both parties concerning which matters would be addressed at trial. In addition to Dana's petition for modification, Chris' counsel argued that Chris' motion for a temporary restraining order and for "immediate emergency sole care, custody and control of the minor children" was also scheduled to be heard. In this motion, which was filed on April 12, 2019, Chris alleged that Dana had caused "permanent and irreparable injury, harm and/or damage to the minor children of the parties." Chris sought an order awarding him "immediate, sole temporary physical and sole legal custody of the minor children of the parties until the final hearing of this matter." In concluding this motion, Chris prayed for "such other and further relief as he may be entitled to in the premises." The chancellor found that "all the issues are interwoven" and that there was no need to bifurcate the trial of the various motions. Accordingly, there can be no allegation of surprise on Dana's part that legal custody would be at issue at trial or that Dana was unprepared to address issues of legal custody.

¶7. While we agree that Chris' emergency motion for modification of custody does not clearly contain a request for a permanent modification of legal custody, we cannot agree that the matter was not raised at trial. During direct examination by his counsel, the following exchange occurred:

Q. Okay. What are you asking this court to do?

A. Give me custody.

Q. What kind of custody?

A. Full.

4

Q.    Why?

A.    To put a stop to all this. . . .

It is clear from this exchange that Chris was asking the court to award him sole custody, both legal and physical, of the minor boys. There was no objection from Dana as to this request, therefore, the issue was tried by implied consent. In *Murrell v. Brown*, 202 So. 3d 287, 290 (¶8) (Miss. Ct. App. 2016), this Court stated:

> Rule 15(b) of the Mississippi Rules of Civil Procedure provides that "[w]hen issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The Mississippi Supreme Court has held: "[I]f evidence is offered by a party which is outside the scope of the pleadings and the other party fails to object, the opponent will be considered to have impliedly consented to the issue and the pleading will be amended accordingly[.]" *Lahmann v. Hallmon*, 722 So. 2d 614, 619 (¶16) (Miss.1998) (citing *Queen v. Queen*, 551 So. 2d 197, 202 (Miss.1989)); *see also Renfroe v. Berryhill*, 910 So. 2d 624, 629 (¶20) (Miss. Ct. App. 2005) (finding that because the defendant "failed to object and . . . his actions at trial indicate[d] that he did recognize the entrance of the issue into the case, . . . the issue of [the plaintiff's] employment status was tried by implied consent") (citing *Lahmann*, 722 So. 2d at 619 (¶¶15-16); *Shipley v. Ferguson*, 638 So. 2d 1295, 1300 (Miss. 1994)).

¶8.    Further, Mississippi Rule of Civil Procedure 54(d) states in part:

> Every other final judgment should grant the relief to which each party is entitled if such relief is within the jurisdiction of the court to grant, even if the party has not demanded that relief in its pleadings.

In making a determination to modify child custody, this Court stated in *Stuckey v. Stuckey*, 341 So. 3d 1030, 1036-37 (¶15) (Miss. Ct. App. 2022):

> Our supreme court observed that "[a]bove all, in modification cases, as in original awards of custody, **we never depart from our polestar consideration: the best interest and welfare of the child**." *Stewart* [*v. Stewart*], 309 So. 3d [44,] 82 (¶127) [(Miss. Ct. App. 2020)] (quoting *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996)). The court further explained:

5

> The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. **In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer**.

*Id*. (citations and internal quotation marks omitted) (quoting *Riley*, 677 So. 2d at 745).

(Emphasis added).

¶9.     The parties had agreed to joint legal and physical custody at the time of the divorce, however, there is ample evidence in the record that this arrangement was not working. Concerning joint custody, in *Waller v. Waller*, 754 So. 2d 1181, 1184 (¶13) & n.1 (Miss. 2000), the supreme court noted:

> According to Vitauts M. Gulbis, Annot., *Propriety of Awarding Joint Custody of Children*, 17 A.L.R.4th 1013, 1016 (1982) "**[i]t has been held that the cardinal criterion for an award of joint custody is the agreement of the parties and their mutual ability to cooperate in reaching shared decisions in matters affecting the child's welfare**." Indeed, in many jurisdictions, joint custody may not be awarded where the parties do not consent to or desire it. *In re Marriage of Neal*, 92 Cal. App. 3d 834, 155 Cal. Rptr. 157 (1979) (joint legal custody was an abuse of discretion where the parties had not agreed to it); *Imes v. Imes*, 367 N.E.2d 1075 (1977) (where parents agreed that only one parent should have custody, trial court's award of joint custody reversed); *In re Marriage of Burham*, 283 N.W.2d 269 (Iowa 1979); *In re Marriage of Handy*, 605 P.2d 738 (1980); *Berlin v. Berlin*, 428 A.2d 1113 (1981).
>
> **Other courts have held that an award of joint custody is an abuse of discretion where the evidence showed that the parents could not cooperate**. *R.L.H. v. J.A.B.*, 642 So. 2d 482 (Ala. Civ. App.1994); *Hunter v. Hunter*, 540 So. 2d 235 (Fla. Dist. Ct. App.1989); *Flournoy v. Flournoy*, 546 So. 2d 617 (La. App.1989); *Wonser v. Wonser*, 415 A. 2d 881 (1980); *Mastropole v. Mastropole*, 436 A. 2d 955 (A. D. 1981); *Braiman v. Braiman*,

6

378 N.E. 2d 1019 (1978); *Bergson v. Bergson*, 68 A.D. 2d 931, 414 N.Y.S. 2d 593 (1979); *Malone v. Malone*, 842 S.W. 2d 621 (Tenn. Ct. App. 1992).

Cooperation between the parents is paramount even in jurisdictions where there is a presumption that joint custody is in the best interest of the child. *Yelverton v. Yelverton*, 621 So. 2d 36 (La. App. 1993); *Rosenfeld v. Rosenfeld*, 529 N.W. 2d 724 (Minn. Ct. App. 1995).

¶10. As will be discussed below, the chancery court found that a material change in circumstances had occurred and that such change had adversely affected the minor children. The chancery court then conducted its *Albright* analysis. It was clearly within the chancellor's discretion to make a change to both legal and physical custody upon his determination that the best interest and welfare of the minor children required such a change. We find that the chancery court did not err by awarding sole legal and physical custody to Chris under the facts and circumstances of this case.[6]

> **II.** **Dana contends that the chancery court erred by finding that a material change in circumstances had occurred that was adverse to the minor children.**

¶11. Dana argues four points in support this assignment of error. First, she maintains that the chancellor erred by finding that "a material change in circumstances had occurred which justified a modification of custody." Second, she contends that the court erred by considering "facts and allegations which predated the last custody order of the court." Third, she argues that the chancellor "failed to make specific findings of fact related to the issue of whether a material change in circumstances had occurred since the date of the last custody decree."

---

[6] While the chancellor erred by his reliance upon Chris' November 17, 2017 motion in his judgment, we can affirm his decision on a different basis. *See Boone v. State*, 148 So. 3d 377, 379 (¶7) (Miss. Ct. App. 2014).

Finally, she disputes that any "alleged material change in circumstances" had adversely affected the minor children.

¶12.   Our standard of review as to changes in custody is stated in *Lambert v. Lambert*, 872 So. 2d 679, 683-84 (¶18) (Miss. Ct. App. 2003):

> Our standard of review of the decision of a chancellor is limited and we will reverse only where the decision is manifestly wrong or clearly erroneous or the chancellor has applied an erroneous legal standard. *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶14) (Miss. Ct. App. 2002). In considering whether a change in custody is warranted, the Court looks to the following:
>
> > First, a party must show that since entry of the judgment or decree sought to be modified, there has been a material change in circumstances which adversely affects the welfare of the child. *Smith v. Jones*, 654 So. 2d 480, 486 (Miss. 1995). Second, the party must also show that the best interest of the child requires a change in custody. *Id*. We further note that not every change in circumstances is so adverse that a modification of custody is warranted; however, the chancellor must consider the circumstances of each case in light of the totality of the circumstances. *Ash v. Ash*, 622 So. 2d 1264, 1266 (Miss. 1993). However, "[i]n all child custody cases, the polestar consideration is the best interest of the child." *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994).
>
> *Creel*, 831 So. 2d at 1183 (¶5).

¶13.   In determining whether there had been a material change in circumstances in her home, Dana contends that the chancellor improperly considered "facts and allegations which predated the last custody order of the court." Dana alleges that the "most recent custody decree" is an order dated March 31, 2017, which denied Chris' prior counterclaim for custody filed on May 21, 2016. Dana argues that any consideration of events predating March 31, 2017, was error and justifies reversal. However, the record shows that there has

8

been no modification of the original custody provision contained in the original divorce decree filed on September 9, 2014.[7] Accordingly, we find the chancellor did not err by considering events from and after that date.

¶14.     Dana further contends that the chancellor failed to make specific findings of fact regarding whether a material change in circumstances had occurred. Dana cites *Clifton v. Shannon*, 93 So. 3d 70, 73-74 (¶13) (Miss. Ct. App. 2012), in support of her argument. In that case the chancellor failed to make written findings of fact and conclusions of law as to whether there had been a material change in circumstances that adversely affected the child. *Id*. Instead, this Court found that the chancellor changed custody mainly based upon the minor child's preference. *Id*. at 72 (¶4).

¶15.     In the present case, the chancellor's judgment, with an exhibit, is over forty-one pages long. The order contains three full pages describing a portion of the contentious procedural history of this case since the entry of an *agreed* final decree of divorce. Over seventeen pages of the judgment are directed to the chancellor's analysis of whether there has been a material change in circumstances in the parties' homes. The chancellor's complete "Findings of Fact and Conclusions of Law" is over thirty-five pages long.

¶16.     The chancellor began his findings of fact and conclusions of law section of his

---

[7] *See Williams v. Willis*, 49 So. 3d 122, 124 (¶4) (Miss. Ct. App. 2010) (recognizing "last custody order" as the last order *modifying* custody); *Savell v. Morrison*, 929 So. 2d 414, 417 (¶9) (Miss. Ct. App. 2006) ("All events that have occurred since the issuance of the *decree sought to be modified* may be considered by the chancellor."); *Robison v. Lanford*, 822 So. 2d 1034, 1040 (¶27) (Miss. Ct. App. 2002) ("Further, to the extent the conduct appeared relatively minor at the time of the earlier decree, its continuation or worsening since were relevant in the chancellor's consideration.").

judgment, relative to the issue of a modification of child custody, by first discussing his decision as to "the demeanor of, and the credibility the Court accorded to, the parties at trial." In *Atkins v. Moore*, 352 So. 3d 217, 226 (¶38) (Miss. Ct. App. 2022), in regard to the deference given the chancellor's determination of the credibility of witnesses this Court stated:

> "We also recognize that because a chancellor is the only one to hear the testimony of witnesses and observe their demeanor, he or she is in the best position to evaluate a witness's credibility." *In re Allen*, 962 So. 2d 737, 741 (¶14) (Miss. Ct. App. 2007).

¶17.   The chancellor stated that he did not "ascribe much credibility to Dana and her testimony." He stated that Dana had a history of making "unfounded allegations of abuse against Chris and his family members, whether to this Court, to the Mississippi Department of Child Protection Services, or to mandatory reporters. None of the allegations of abuse have been substantiated." He noted that the prior chancellor, in an order filed on June 20, 2016, had "enjoined Dana from filing any more complaints against Chris or his family with DHS, any law enforcement agency, or any other court, without this Court's written consent." He further noted that the prior chancellor had entered another order on December 6, 2017, that restrained and prohibited Dana from taking the boys to any mental or physical healthcare provider without the consent of the guardian ad litem (GAL).

¶18.   The chancellor points out that as a result of "troubling filings and allegations made by Dana," he had ordered both parties to undergo mental evaluations by Dr. Nelson Cauthen.[8]

---

[8] This order was the apparent result of the "Petition for a Temporary Restraining Order" Dana filed on January 29, 2019, seeking to have Chris' custody rights suspended on a temporary basis. Among other things, Dana alleged that Chris had burned E.P.'s buttocks

Based upon his evaluation of Dana, as it related to her credibility, Dr. Cauthen testified at trial that Dana could not be counted on to tell the truth. He testified that in the totality of his experience during his evaluation, he found Dana not to be a trustworthy person.

¶19. The chancellor continued in his assessment of Dana's credibility by pointing to issues that arose during trial. He described her behavior during the trial as puzzling and distracting. He further discussed her testimony concerning a writing pen that was capable of recording conversations. At first, Dana denied having ever seen the pen. Then she admitted to having seen B.P. carrying the pen in the past. The chancellor noted that Dana subsequently admitted that she had actually obtained the pen, which she knew to be a listening device, from some unknown person. She denied instructing her children on how to use it. She later admitted to placing the pen in one of the children's backpacks to record Chris' family. When a recording from the pen was played in court, the chancellor stated that he could hear Dana instructing the children on how to operate the pen. The bottom line is the chancellor found Chris more credible than Dana.

¶20. The chancellor's findings of fact and conclusions of law then addressed the allegations Dana made in her motions seeking a change in custody and her trial testimony in that regard. The chancellor spent several pages of his order considering the evidence related to Dana's allegations made in support of her request for a change in custody. The chancellor

with a heated spoon. After a hearing on January 30, 2019, the chancellor, while finding that the evidence presented at the hearing was not clear or unequivocal, entered an order suspending Chris' regular periods of custody of E.P. until "a more thorough investigation can take place." Then, on March 21, 2019, the chancellor amended the temporary restraining order to require both parties to have a mental evaluation by Dr. Cauthen and allowed Chris to have supervised visitation with E.P.

found that Dana's allegations, even if true and taken as a whole, "do not constitute a material change in Chris' home that would allow for the Court to modify custody as requested by Dana."

¶21.    The chancellor then addressed whether there had been a material change in Dana's home that had adversely affected the children. This issue is addressed by the chancellor in the next six pages of the judgment. The court noted at the outset:

> The Court has discussed much of that material change earlier in this Judgment. Most concerning to the Court have been Dana's numerous, unfounded allegations of abuse, her constant use of the court system to harass Chris and his family, her use of the boys to attempt to surveil Chris and his family, and her attempts to surveil him in other ways. All of these behaviors demonstrate an abiding attempt to interfere with Chris' ability to have a meaningful relationship with his children and to ultimately alienate him from them altogether.

¶22.    The chancellor discussed the allegations of abuse Dana made in her January 15, 2019, petition. As a result of this petition and hearings on the allegations contained in the petition, the court required both parents to undergo mental evaluations by Dr. Cauthen. Dr. Cauthen, as noted above, did not find Dana to be a truthful person and found her to be manipulative. In his report, the chancellor noted that Dr. Cauthen "goes on to detail specific instances of irrelevant and untrue stories told to him by Dana." Dr. Cauthen's testimony at trial "focused on Dana's patterns of telling untruths and her apparent solicitation of same from the boys." The judgment quotes Dr. Cauthen's testimony:

> Dr. Cauthen then went on to explain how the pattern of repeated allegations of abuse, the repeated visits with therapists, mental health workers, physicians, and nurses on a regular basis, cause the stories of abuse to become real to the children.

At trial, Dr. Cauthen testified that the believes Dana is encouraging the children—and [E.P.] in particular—to report things to professionals about abuse. In his opinion, that makes it difficult for the boys to have an unbiased relationship with Chris and should be stopped.

¶23. The chancellor recounted the testimony of Ruth Glaze,[9] who said the boys "told her several improbable and unbelievable stories related to their father." She related a story the boys had told concerning Charlie Keeton[10] helping Chris remove the stove top that was allegedly used to heat the spoon that Chris used to burn E.P.'s bottom.[11] Concerning the shared custody arrangement, Glaze testified that the "week-on/week-off arrangement was not working and it was not healthy for the boys."

¶24. The GAL reported that his investigation determined that certain allegations made by Dana were "aggrandized." He discussed Dana's prior allegation of sexual abuse committed

---

[9] As a result of Dana's allegations of abuse in her January 15, 2019 motion, Glaze, a licensed marriage and family therapist and a licensed professional counselor, was appointed by the court to interview the two minor boys to determine whether E.P. was purposefully burned by his father and whether Chris represented an immediate threat to the health, safety, and welfare of either child.

[10] Charlie Keeton was appointed as guardian ad litem for the minor children on November 29, 2017, as a result of allegations of abuse. The nature and extent of his appointment will be addressed *infra*.

[11] Keeton advised the court that this was not true. Ultimately, as a result of this discrepancy and others found in the record, the allegation that Chris burned E.P.'s bottom with a heated spoon because E.P. would not go hunting was determined by the chancellor to be unsubstantiated. While the chancellor noted that he did not share Glaze's belief that Chris was responsible for the injury to E.P.'s bottom, he did share her belief that the contentious nature of the parent's relationship and surrounding circumstances was having a negative effect on the boys.

13

by a member of Chris' family. He reported that Dr. Lott[12] had found insufficient evidence to indicate the boys had been physically or sexually assaulted by anyone. In fact, in a prior order of the court filed on June 20, 2016, in part based upon Dr. Lott's report, the court found that "there is not one shred, particle or scintilla of evidence supporting any inappropriate actions by the Paternal Grandmother." As a result, the restrictions placed upon Chris' mother's contact with the children were set aside.

¶25.    The chancellor's judgment cites another instance contained in the GAL report. Keeton stated that Dana told him that Dr. Lott had told her things not contained in his report. Dana told Keeton that Dr. Lott believed the boys had been abused to some extent. When Keeton questioned Dr. Lott about Dana's statement, Dr. Lott said that he did not tell Dana anything that was not in his report. He advised Keeton that "the boys never reported anything to me that I considered to represent abuse by the grandmother." Keeton reported that while Dr. Lott did not think the boys had been "coached," he was concerned that the repeated allegations of abuse "w[ere] having a negative effect on the boys' behavior; in particular, their initial hostile attitude toward their father during the initial interview of January 20, 2016." According to Keeton, the relationship between the parents was as contentious as he had ever seen. Further, Keeton noted that Dr. Lott believed "the boys' relationship with their father has been negatively influenced by the repeated sessions with Dr. Wheat without their father's

---

[12] By order filed on January 11, 2016, and pursuant to Mississippi Rule of Evidence 706, Dr. Criss Lott was appointed "as an expert in this litigation to evaluate whether the subject minor children have been abused, neglected or coached in any way. Once completed, Dr. Lott's report may be introduced as a general exhibit in these proceedings."

participation."[13]

¶26.    Having considered the record in this case, the exhibits, the testimony, and the totality

of the circumstances, the chancellor concluded:

> the false allegations are of a constant and continuous nature and show that Dana is willing to sacrifice her children's mental and emotional health to obtain custody and alienate Chris and his family from the boys. Her inclination to make misrepresentations to the court, social service agencies and medical providers, her outward manifestations of disdain for Chris and his family, all combine to show this.
>
> **The constant allegations create a custodial environment detrimental to the children's well-being**. The record is dotted with instances where the boys told others they considered their father "mean," made false allegations, or admittedly lied in an effort to appease their mother. The fact that the boys are shuffled before a constantly revolving door of physical and mental health professionals, social workers, judges, guardians ad litem, and others confirm Ruth Glaze's emphatic statement that their lives are going down the toilet.

(Emphasis added).

¶27.    In a case with similar facts, this Court found in *Wilson v. Wilson*, 79 So. 3d 551, 563

(¶¶52-54) (Miss. Ct. App. 2012):

> We find two cases particularly instructive in rendering today's decision. First, in *Jernigan v. Jernigan*, 830 So. 2d 651, 652-54 (¶¶3-6) (Miss. Ct. App. 2002), this Court found no error in a chancellor's determination that a material change in circumstances had occurred where (1) the mother made allegations that the father had sexually abused their child, and (2) these allegations were not substantiated by any testimony or medical evidence. We held these considerations—when combined with other factors, including the mother's misrepresentations to the court and her frequent changes of residence—supported the chancellor's finding of a material change. We found particularly significant that the mother had an "outward manifestation of disdain" for the father, and she attempted to coach her child to share the same

---

[13] Dr. Darryl Wheat, Ph.D., was one therapist that Dana took the boys to without Chris' permission. The GAL determined that the boys' relationships with their father were adversely affected by these sessions.

contempt for him. *Id*. at 653 (¶5). And the mother "was willing to get custody of her child at virtually any cost"—even if it sacrificed the mental and emotional health of the child. *Id*. Thus, a change in custody was warranted.

. . . .

Instructed by *Jernigan* and *Newsom*[*v. Newsom*], [557 So. 2d 511 (Miss. 1990)], we find no error in the chancellor's finding of a material change in circumstances. The chancellor's factual finding that Lauren's abuse complaint against Michael was baseless is convincingly supported by the record. Neither Dr. Lott, DHS, Donald, nor the youth court judge found that any abuse had occurred. As a result of Lauren's actions, Michael was deprived of seeing his children for a considerable time.

In the present case, both Chris and Chris' mother had their time with the minor boys restricted for months, on at least two occasions, as a result of Dana's allegations of sexual abuse by the grandmother and physical abuse by Chris. These allegations of abuse were ultimately found to be unsubstantiated by the chancellors and the restrictions set aside. As noted, at one point the chancellor prohibited Dana from making any further report of abuse without written permission from the court.

¶28.     Dana argues that the chancellor's findings of fact and conclusions of law are not specific enough in identifying the material change in circumstances or in identifying a causal connection between Dana's conduct and any adverse effect upon the children. We find that the forty-plus page judgment's findings of fact and conclusions of law is sufficient. In *Munday v. McLendon*, 287 So. 3d 303, 311 (¶31) (Miss. Ct. App. 2019), the Court found:

Although the chancellor did not spell out in her opinion what "material change in circumstances" had occurred, she clearly found facts that supported that it had occurred.[14]

---

[14] The *Munday* opinion's footnote 6 follows:

16

¶29. We find that the chancellor's decision that a material change in circumstances in Dana's home has occurred since the final decree and that such change has had an adverse impact on the children's well-being is supported by substantial evidence. The decision is not manifestly wrong or clearly erroneous, and the chancellor applied the correct legal standard. *See Stewart v. Stewart*, 309 So. 3d 44, 69 (¶68) (Miss. Ct. App. 2020); *Jernigan v. Jernigan*, 830 So. 2d 651, 52 (¶2) (Miss. Ct. App. 2002).

> **III. Dana contends that the chancery court erred in its analysis and evaluation of several of the *Albright* factors as those factors related to the custody of the minor children of the parties.**

¶30. Having found a material change adverse to the boys, the chancellor turned his attention to making a determination of whether it was in the best interest of the minor boys to make a change in custody. The chancellor went through a detailed analysis of the *Albright* factors and the evidence relevant to each factor. We will review the chancellor's analysis below:

1. Age, Health, and Sex of the Children

¶31. The chancellor found that neither of the boys were of tender years and could be cared for equally by both parents. The boys appeared to be in good physical health. The court

---

"We fully recognize that chancellors are overburdened . . . . Chancellors are required to follow the testimony of witnesses, review documents offered as exhibits, and attempt to make contemporaneous notes." *Lowrey v. Lowrey*, 25 So. 3d 274, 280 (¶7) (Miss. 2009). Applying a rigid, formalistic "word" requirement in each order that is otherwise clear as to the judge's findings of fact and conclusions of law would only add to the burdens of work the court system maintains daily. However, it may be the safer practice to include those words in orders in the future since it is not hard to envision a written order not as detailed or as clear as the one in this case.

recognized that the boys have endured mental health treatment for much of the time after the divorce. The chancellor found this factor was neutral. Dana disagrees and argues that it was Chris' behavior that necessitated the treatment of the children that the court finds so disruptive. However, as noted above, all allegations of abuse have been found to be unsubstantiated.

## 2. Continuity of Care

¶32. The chancellor noted that the September 9, 2014, judgment had awarded the parties joint physical custody on a week-on/week-off basis. The court noted that with the exception of a seven-month period during which Chris' custody was limited by a temporary restraining order, the boys have been under the custodial care of the parties equally. The court found this factor was neutral. Dana objects and argues that while the record showed she was a "hands on" mom, dedicating all her spare time to caring for the boys, Chris often has other family members care for the boys. Dana argues that "[t]here is a difference between allowing and encouraging your children to spend time with your extended family on the one hand, which Petitioner agrees is admirable, and sloughing off your obligations and duties to your children onto your extended family members, which is what Chris does." In the court's analysis, the chancellor already dealt with these allegations by Dana and found that "there is nothing wrong with allowing the boys to enjoy a more full familial relationship with Chris' family." The chancellor found that there was no evidence presented that the time Chris allowed the boys to stay with members of his extended family was unhealthy.

## 3. Parenting Skills

¶33. The court recognized the different parenting styles of Chris and Dana. The court discussed the parents' differing levels of involvement in various activities of the boys. Because the evidence showed that Dana was more involved in the boys' school work and day-to-day lives, the chancellor found this factor favored Dana. Dana takes no issue with this finding on appeal.

### 4. Capacity to Provide Primary Childcare and Employment Responsibilities

¶34. Although Chris owns his own business and has flexibility when it comes to his work schedule, the chancellor found that Dana had more flexibility with her schedule. The chancellor found this factor to favor Dana and she takes no issue with this finding.

### 5. Physical and Mental Health and Age of the Parents

¶35. The court noted that neither parent had any physical limitations to their ability to provide childcare and to parent. However, the court incorporated into its consideration of this factor Dr. Cauthen's evaluations of Dana. Those issues were previously addressed in the order concerning Dana's propensity to be untruthful and manipulative and her apparent solicitation to have the boys be untruthful. The chancellor found this factor to favor Chris. Dana argues the chancellor erred because he relied solely on the report of Dr. Cauthen. Dana alleges that Dr. Cauthen was "undisputedly biased" in his report.

### 6. Moral Fitness of Each Parent

¶36. The court found that both parties attended church regularly. The chancellor stated that with the exception of Dana's attempt to have the boys record Chris and his family, he believes both attempt to instill high moral values in the boys. However, because, as

19

previously noted, the court found Dana was not entirely truthful in her testimony and because testimony as to Chris' morality was without blemish, the chancellor found this factor favored Chris. Again, Dana argues the chancellor found this factor to favor Chris based "primarily" on Dr. Cauthen's report and testimony. According to her brief, "[t]he chancery court erred in finding that this factor weighs against Dana based on her alleged untruthfulness when neither the chancery court nor Dr. Cauthen cited to a single instance of alleged dishonesty which was supported by other credible evidence at the trial." She alleges that the boys' undisputed testimony regarding their father's mean treatment of them showed that Chris was not a moral person. However, the court had already noted that Dana's trial testimony concerning the recording by a pen to be untruthful at multiple points. Further, the court found many of the allegations of Chris' meanness toward the boys were unsubstantiated and, in subsequent factors, found that the boys shared an emotional bond with Chris.

### 7. Home, School, and Community Record of the Children

¶37.    The court noted that B.P. makes good grades. E.P.'s grades declined during the time of the "spoon burning," but Dana testified that E.P.'s grades improved while she had sole custody of E.P. After the court reestablished Chris' joint physical custody, Dana testified that E.P.'s grades declined again. The court found that the boys attend church with both parents. Both parents have the boys involved in various outdoor activities. The testimony showed that the boys had more interaction with Chris' extended family than with Dana's extended family. The court found this factor was neutral. Dana argues that finding this factor neutral was also error. She argues that the testimony shows that she played a stronger role in the boys' lives

20

than did Chris.

### 8. Preference of a Child Age 12 or Older

¶38. This factor was not considered by the chancellor because neither boy was old enough to express a preference.

### 9. Stability of the Home Environment and Employment of Each Parent.

¶39. The court noted that Dana's home is in danger of foreclosure and that she filed Chapter 13 bankruptcy on May 1, 2018. That filing was dismissed, and she filed again on April 30, 2019. Both bankruptcy filings were dismissed because she failed to make payments to the trustee. She re-filed for Chapter 13 bankruptcy on March 9, 2020, and that filing was still pending at the time of trial. Chris has a three-bedroom house and a bonus room upstairs. He shares this home with his wife and their child, as well as B.P. and E.P. Dana works as a real estate agent. Her net monthly pay and total monthly expense result in a monthly deficit of $270. Chris' net monthly income is $5,200 and monthly expenses are $2,760. The court found that this factor favors Chris. Dana argues that the "trial court improperly found that this factor weighed in favor of Chris primarily due to Dana's bankruptcy and the fact that Chris made more money." She argues the factor should have been neutral due to overwhelming evidence that she never failed to provide for her children and that she paid more educational expenses for the children than did Chris.

### 10. Emotional Ties of the Parent and Child.

¶40. The court found that evidence showed that the boys are the most important aspect of Dana's life and that there was much evidence of them enjoying activities together. Dana

testified that she feels the boys are insignificant to Chris and that she cannot say that Chris loves the boys. The chancellor stated that he did not share her poor assessment of the emotional bond between the boys and Chris. The chancellor referred to his view of Chris' testimony about his relationship with the boys. The court stated that it "is convinced that the boys share an emotional bond with both parents." The court also recognized that the joint custodial arrangement and all the drama it causes has had an impact on the boys. The chancellor found that this factor favors both parents equally. Dana argues the chancellor improperly found this factor neutral "based solely on the testimony of Chris about his relationship with his children," and ignored the testimony of the boys and Ruth Glaze. She argues this factor should have heavily favored her.

## 11. Other Relevant Factors

¶41.    The chancery court's analysis of this factor reads as follows:

> The Court has discussed at length its concerns with parental alienation and interference. This case represents an extreme example of interference on the part of Dana. Her all-consuming focus of "fighting" for her kids, her animosity toward Chris and his mother–which this Court still does not understand–, her inability to leave Chris alone to be a parent, her repeated allegations of abuse, which the court, in the most strongest language, have found to be baseless, are an important factor this Court cannot ignore. The interference has already started to cause concerning alienation, or at least confusion on the part of the boys, as to their father.

> Chris, on the other hand, has exhibited what this Court considers to be incredible restraint. The destruction of the boys' lives is not caused by Chris, but rather by the constant interference from Dana. Consideration of this factor heavily weighs in Chris' favor.

Dana again argues that the chancellor "does not cite any specific instances wherein Dana has taken action which were proven to be improper, illegitimate or dishonest." She argues that

all she has done over the course of the boys' lives is to act "to defend the minor children from their tyrannical father, as any good parent would do." She argues that the court's decision is not supported by the record and "is based on the trial court's conjecture and speculation."

¶42. As a result of the chancellor's analysis of the *Albright* factors, the court awarded Chris sole physical and legal custody of E.P. and B.P., subject to Dana's rights of visitation as set forth by the judgment. In *Riley v. Heisinger*, 302 So. 3d 1243, 1254-55 (¶¶44-46) (Miss. Ct. App. 2020), this Court described the process to be followed and our standard of review of the chancellor's *Albright* analysis as follows:

> As noted just above, if the chancellor finds that there has been a material, adverse change in circumstances, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Strait* [*v. Lorenz*], 155 So. 3d [197,] 203 (¶20) [(Miss. Ct. App. 2015)]. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, the issue on appeal is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).
>
> "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. The chancellor's evaluation of the child's best interest must consider the following factors: (1) the age, health, and sex of the child; (2) which parent has had "continuity of care"; (3) the parties' "parenting skills"; (4) the parties' "the willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) the parties' "moral fitness"; (9) "the home, school and community record of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id*.

The chancellor must address each *Albright* factor that is applicable to the case, *Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001), but the chancellor need not decide that each factor favors one parent or the other. *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require the chancellor to award custody "to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "[T]he chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's application of the factors for manifest error, giving deference to the weight that he assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

We find that the chancellor's findings of fact as to each of the *Albright* factors are supported by substantial evidence. While Dana, in some instances, would weigh the evidence differently than the chancellor, we find that the chancellor did not commit manifest error in consideration of the various factors and the weight he chose to give each factor. Therefore, we find the chancellor did not err by finding that it was in the best interest of the minor children to modify the custody provisions of the original decree and award sole legal and physical custody to Chris.

**IV. Dana contends that the chancery court erred when it modified the custody of the minor children of the parties to give sole physical custody and sole legal custody of the minor children of the parties to Chris.**

¶43. In this assignment of error, Dana continues her attack upon the chancellor's findings of fact and conclusions of law. She contends that "the allegations of the trial court which form the sole and only ultimate basis for the trial court's modification of both physical and legal custody are not accurate." She argues that the chancellor's characterization of her conduct is not supported by the record. She contends that Chris has been just as "litigious"

24

as Dana since the divorce. Dana's brief on this issue then recites much of the procedural history of this case.

¶44.   She challenges the court's determination that her actions were meant to alienate the children from Chris. She recounts Chris' alleged burning of E.P.'s bottom with a spoon and suggests that there was no evidence that she influenced the boys to make this allegation. She again argues that Glaze believed E.P.'s story and that Glaze advised the court that she did not believe that Dana told the boys to lie about anything. She argues that she should not be blamed for bringing this matter to the court's attention. She points to the fact that the court held multiple hearings on this issue, granted her request for a temporary restraining order, and extended the restraining order twice. She contends that the chancery court erred "when it came to the conclusion not only that the boys were lying but also that Dana was somehow the mastermind behind the creation and proliferation of this information."

¶45.   Dana says that Glaze did not believe that the boys should be in their father's custody because of the burning allegation and other comments made by the boys. She noted that the GAL did not believe the custodial schedule should be altered to take the boys from either parent for long periods of time. She also challenges the reliability of the testimony of Dr. Cauthen and argues that the court erred by giving his testimony the most weight.

¶46.   While Dana has made factual arguments as noted above, she has cited no authority to support this assignment of error. In *Mitchell v. Mississippi Department of Employment Security*, 348 So. 3d 1030, 1035 (¶14) (Miss. Ct. App. 2022), this Court repeated:

> This Court has held consistently that the "[f]ailure to cite any authority is a procedural bar, and [a reviewing court] is under no obligation to consider the

25

assignment." *Taylor v. Kennedy*, 914 So. 2d 1260, 1262 (¶4) (Miss. Ct. App. 2005); *accord Jefferson* [*v. State*], 138 So. 3d [263,] 265 (¶¶8-9) Miss. Ct. App. 2014) (holding that "[t]he appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal").

This failure to cite authority renders this assignment of error procedurally barred. In any event, we note that the issue of the credibility of witnesses, the weight given to the various witnesses, and the conclusions reached from the evidence presented are all matters that are left to the discretion of the chancellor as we found in *Catlett v. Catlett*, 358 So. 3d 366, 375 (¶44) (Miss. Ct. App. 2023):

> Additionally, as the trier of fact, the chancellor has the authority to weigh the credibility of witnesses and documents. "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on [the] credibility of the witnesses and the weight of their testimony." *Ellison v. Meek*, 820 So. 2d 730, 734 (¶11) (Miss. Ct. App. 2002). "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *O'Briant v. O'Briant*, 99 So. 3d 802, 806 (¶19) (Miss. Ct. App. 2012). Therefore, and as said so many times before, "[t]he findings of a chancellor will not be disturbed unless this Court finds the chancellor abused his discretion, was manifestly wrong or made a finding which was clearly erroneous." *Matthews* [*v. Whitney Bank*], 282 So. 3d [786,] 792 (¶21) [(Miss. Ct. App. 2019)].

We find that the chancellor did not commit manifest error and that his findings of fact and conclusions of law are supported by the record.

**V.**     **Dana contends that the chancery court erred by refusing to allow the GAL to give his full recommendations and opinions regarding custody of the minor children and in failing to take his recommendations into consideration when ruling on the modification of custody.**

¶47. In *Warren v. Rhea*, 318 So. 3d 1187, 1190-91 (¶¶16-17) (Miss. Ct. App. 2021), we explained:

Chancery courts are required by law to appoint a GAL when allegations of child abuse or neglect are raised during custody proceedings. Miss. Code Ann. § 93-5-23 (Rev. 2018). "[T]here is certainly no requirement that a chancellor defer to a [GAL]'s findings." *Barber v. Barber*, 288 So. 3d 325, 333 (¶33) (Miss. 2020). "Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." *Barbaro v. Smith*, 282 So. 3d 578, 600 (¶100) (Miss. Ct. App. 2019).

However, "when the appointment is mandatory, a chancellor must include a summary of the [GAL]'s recommendations in his or her findings of fact and conclusions of law." *Barber*, 288 So. 3d at 333 (¶32) (internal quotation marks omitted). "[A] chancellor's failure to consider a mandatorily appointed [GAL]'s findings is an error of the utmost seriousness." *Id*. at 332 (¶29). Additionally, "when a chancellor's ruling is contrary to the recommendation of a statutorily required [GAL], the reasons for not adopting the [GAL]'s recommendation shall be stated by the court in the findings of fact and conclusions of law." *Barbaro*, 282 So. 3d at 600 (¶100).

¶48. Dana argues that the chancellor erred in failing to allow the GAL to "provide a recommendation as to whether custody should be modified." The order appointing Keeton as the GAL clearly defines the role of the GAL "[a]s an arm of the court, to investigate, find facts, and make an independent report to the Court." The GAL report provided to the chancellor stated that Keeton's appointment was the result of Chris' motion for temporary restraining order, citation of contempt, sanctions and modification of custody "for repeatedly taking the boys to the healthcare providers other than those identified in the divorce agreement." Chris' motion was basically a complaint that Dana was taking the boys to healthcare providers not authorized by the divorce agreement and without Chris' knowledge. On December 6, 2017, the chancellor sua sponte denied Chris' motion but did determine that it was in the boys' best interest that neither party take the boys to any healthcare professional without the GAL's prior consent unless it was an emergency situation, to which the GAL was

to be informed of as soon as possible.

¶49.    Numerous counseling sessions followed with Keeton's approval, and with the knowledge of counsel for both Chris and Dana. Keeton conducted extensive interviews with many witnesses, including the boys, their teachers, and many healthcare providers. At the conclusion of trial, the following exchange regarding the GAL report took place:

> THE COURT: All right. The Court wants to hear from the guardian ad litem. And as I have stated, the Court is required to hear from the guardian ad litem since, you know, Mr. Keeton was appointed as the guardian ad litem in 2017, in November 29th of 2017, to be specific, in response to an emergency motion filed by Mr. Patrick related to Ms. Patrick taking the children to medical providers other than Dr. Jennifer Bryant at University Physicians Clinic. And the Court entered an order at that time appointing Charles Keeton as the guardian ad litem. That's where he came into this proceeding. The order appointing him states that the role of the guardian ad litem is, as an arm of the Court, to investigate, find facts, and make an independent report to the Court. And on December 6th, 2017, this Court entered a sua sponte order that stated the parties were enjoined and restrained and otherwise prohibited from taking the minor children to any mental or physical health care professional without prior consent from Mr. Keeton. There was never any order dismissing Mr. Keeton as the guardian ad litem in that case, so in January of 2019 when we had the emergency hearing after Ms. Dana had filed her most recent petition for modification and contempt, after hearing the testimony at that emergency hearing -- and that included from Dr. Christopher Boston -- the Court made the determination to appoint Charlie Keeton as guardian ad litem for the purpose of investigating the allegations of abuse that were made. And that was the limit of Mr. Keeton's role. With that being said, Mr. Keeton, you are an officer of this Court. You are a licensed practicing attorney of this court. Just like with Mr. Rainer and Ms. Thibodeaux, I'll dispense with the need for administering the oath to you. Can you tell the Court about your investigation[?]
>
> MR. KEETON: Yes, Your Honor. I have prepared a report, and the report has not been entered into evidence. It's not been filed in this case. The case is a sealed case, so I could not file it on MEC. But I did provide counsel opposite with a copy of the report by email back on August 25th of 2019, before our first trial. As you stated, I was appointed originally by Judge Grant, who was the presiding judge at the time, to act in a limited role, the way I saw it, as a watchdog, mediator, whatever, officer of the court to help the parties if they

28

should have some type of medical emergency or a medical procedure for one or both of the children. And when I originally interviewed Ms. Patrick, that's what I meant when I told her that I wasn't exactly sure what my role was because it was unusual to be appointed in such a limited role. And I did mention to her that I would speak with Mr. Rainer to make sure that I was understanding the order correctly. And I did speak with Mr. Rainer, and at the time Brannon Berry was the attorney for Mr. Patrick, and everybody was in agreement that the wording of the order was that I was to be notified before the children were taken to a doctor.

¶50.    When questioned by Dana's counsel, Keeton and others said the following:

Q. So I noticed that your report didn't include any conclusions about the allegations that there have been substantial and material changes in this matter since the last judgment was entered in, I think was March 4 of 2016. What, if any, conclusions did you come to that? Or did you come to any conclusions?

A. I reserve the right to give a conclusion if the Court wants me to go into that, and I have no problem with giving my opinion as to what I think should happen if the Court wants me to.

MR. RAINER: Would that be helpful to the Court?

THE COURT: It wouldn't be. That was not what the guardian ad litem was appointed to do. That's outside the scope of what his role was. He was put there to investigate the allegations of abuse and neglect that were made.

MR. RAINER: So it wouldn't be helpful to the Court?

THE COURT: It wouldn't be helpful to the Court. Now, I am incredibly timid when it comes to guardians ad litem since, like I keep mentioning, that recent *Barber v. Barber* case where it looks like to me where the Supreme Court of the State of Mississippi admonished a chancery judge who limited the guardian ad litem giving testimony. But it wouldn't be helpful since that was not part of the role that the Court appointed the guardian ad litem to do.

The original order appointing Keeton limited his role, in his words, "as a watchdog, mediator, whatever, officer of the court to help the parties if they should have some type of medical emergency or a medical procedure for one or both of the children." The order was

later expanded to an investigation of the allegations of abuse. The GAL's findings in that regard were presented to the court in the GAL's report and through his testimony. It should be noted that a GAL is required to make a recommendation to the court only if requested by the court to do so. *See Barber*, 288 So. 3d at 332 (¶28); *Smith v. Smith*, 206 So. 3d 502, 510 (¶14) (Miss. 2016). Here, clearly, the chancellor did not request that the GAL make a recommendation.

¶51. In any event, in support of her argument, Dana cites *Barber*, 288 So. 3d at 333-34 (¶¶30-33), where the supreme court found it error to refuse to address the guardian ad litem's report and recommendations. She argues that the GAL there was also appointed just to investigate allegations of abuse and neglect. *Barber* is distinguishable from this case. The chancellor here *did* include a summary in his judgment of the GAL's report regarding what the chancellor had appointed him to consider, the allegations of abuse. Further, the chancellor agreed with the GAL's finding that Chris had not abused E.P. The chancellor's judgment specifically states that "[a]t trial, Mr. Keeton testified that, based on his extensive investigation, neither Chris nor his family members present a danger to the boys."

¶52. In *Barber*, 288 So. 3d at 333 (¶32), we held that

> when the appointment is mandatory, "[a] chancellor must include a summary of the guardian ad litem's recommendations in his or her findings of fact and conclusions of law." *Borden* [*v. Borden*], 167 So. 3d [167,] 243 [(Miss. 2020)] (citing *S.N.C.*, 755 So. 2d at 1082). We said that, "[w]hile the chancellor in the current case acknowledged the guardian ad litem's recommendation, he did not provide a summary of the report or a summary of his reasons for rejecting the guardian ad litem's recommendation. Therefore, we find the chancellor erred in failing to do so." *Id.*; *see also J.P. v. S.V.B.*, 987 So. 2d 975, 982 (Miss. 2008) ("While a chancellor is in no way bound by a guardian's recommendations, a summary of these recommendations in addition to his

reasons for not adopting the recommendations is required in the chancellor's findings of fact and conclusions of law." (internal quotation marks omitted) (quoting *Floyd v. Floyd*, 949 So. 2d 26, 29 (Miss. 2007))); *cf. Barbaro v. Smith*, 282 So. 3d 578, 600 (Miss. Ct. App. 2019) (**"Reasons are required only when 'a chancellor's ruling is contrary to the recommendation of a statutorily required [guardian ad litem.']** Here, the chancellor's ruling was consistent with the [guardian ad litem's] recommendation. Accordingly, the chancellor sufficiently addressed the [guardian ad litem's] report.**" (quoting *S.N.C.*, 755 So. 2d at 1082)).

(Emphasis added). The same is true here.

¶53. Because the chancellor clearly considered the GAL report for the purpose it was intended, and discussed those findings in his opinion, we find no error.

### VI. Dana contended that the chancery court erred when it denied her motion for a new trial, or in the alternative, an amended judgment.

¶54. Dana argues in just two sentences that she gave the chancellor a chance to correct his error and make the right ruling. In *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022), we stated:

> Mississippi Rule of Appellate Procedure 28(a)(7) governs the argument section of appellate briefs, and states, "The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." The rule "does not simply require a party to mention authority; the authority must be used to develop the argument in a meaningful way." *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016) (emphasis added) (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). Arguments that do not comply with the rule are procedurally barred. *Hill v. State*, 215 So. 3d 518, 524 (¶10) (Miss. Ct. App. 2017).

This issue is procedurally barred.

### CONCLUSION

¶55. For the reasons discussed above, we affirm the chancery court's judgment.

31

¶56. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND SMITH, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**